# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHELSEA WITHERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00874** |
| | ) | **Judge Aleta A. Trauger** |
| **THE NASHVILLE HISTORIC** | ) | |
| **CEMETERY ASSOCIATION, LLC** | ) | |
| **d/b/a MOUNT OLIVET FUNERAL** | ) | |
| **HOME AND CEMETERY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Chelsea Withers brings this lawsuit against her former employer, the Nashville Historic Cemetery Association, LLC d/b/a Mount Olivet Funeral Home and Cemetery ("Mount Olivet"), asserting claims based on its alleged failure to accommodate, failure to engage in the interactive process, disability discrimination, and retaliation in violation of the Americans with Disabilities Act ("ADA"). (*See* Complaint, Doc. No. 1.) Now before the court is Mount Olivet's Motion for Summary Judgment, seeking judgment in its favor on all claims set forth in the Complaint. (Doc. No. 22.) For the reasons set forth herein, the defendant's motion will be granted and this case dismissed.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.     FACTS[1]

### A.     The Plaintiff's Employment at Mount Olivet

Mount Olivet operates a funeral home and cemetery in Nashville, Tennessee. (Doc. No. 25-4, Wells Decl. ¶ 3.) Mount Olivet is one of nine Nashville-area funeral homes affiliated with Service Corporation International ("SCI"). (*Id.* ¶ 4). It is a small location with relatively low traffic and a low call volume of 75 to 110 calls per year. (Doc. No. 25-3, Wells Dep. 27;[2] *see also* Doc. No. 25-1, Withers Dep. 59 (acknowledging that Mount Olivet does not conduct a large number of funerals).)

Mount Olivet hired Withers as a Funeral Services Assistant on May 1, 2019. Her first manager at Mount Olivet was Mary Ann Morgan, before Rodney Wells took over as General Manager of that location in May 2020.[3] Wells reports to market manager director Jeff Duffer. (Wells Dep. 16.)

Withers' position throughout her employment was part-time as needed. However, she testified that, prior to COVID, she worked a "more routine schedule," typically "multiple times during the week." (Withers Dep. 56.) "[W]hen COVID happened," however, her schedule was reduced from "maybe two or three times a week" to "every other week." (*Id.*) Even under Morgan,

---

[1] All facts set forth herein are undisputed for purposes of summary judgment or viewed in the light most favorable to the plaintiff as the nonmoving party, unless otherwise indicated. The facts for which no citation is provided are undisputed for purposes of the defendant's summary judgment motion and are drawn from the plaintiffs' Response (Doc. No. 28) to the defendants' Statement of Undisputed Material Facts ("SUMF") (Doc. No. 24).

[2] The original pagination of Wells' deposition transcript is inconsistent with the pagination assigned by CM/ECF, because the original transcript contains an unnumbered cover page. The court will employ the original pagination.

[3] Wells testified that, although Withers was initially hired as a "removal technician," by 2021, she was employed as a receptionist at Mount Olivet. (Wells Dep. 21, 26.) He also confirmed that a "funeral services assistant is the same thing as a receptionist." (*Id.* at 73.)

her schedule was not really "set," but she worked less after Wells took over in May 2020. (*Id.* at 58–59.)[4]

Withers typically worked alongside other Funeral Services Assistants, so if she or any other as-needed employee was unable to cover a shift, the scheduling manager would call the next employee on the list until he or she found someone available to work.

### B. The Plaintiff's Disability

Withers suffers from Tricuspid Atresia—a type of congenital heart defect. She also suffers from respiratory failure. Mount Olivet was aware of her disability, because, for most of the time she was employed at Mount Olivet, she required the occasional use of supplemental oxygen. She brought her oxygen cylinder to work occasionally and kept it in the corner behind the reception desk to use as needed. (Withers Dep. 84.) Because of her medical condition, Withers was occasionally unable to accept shifts she was asked to work or was off work for several weeks at a time, because she either had a doctor's appointment or was hospitalized for a procedure. (*Id.* at 78.) In addition, on rare occasions, she became ill at work and had to request to leave early.

### C. The Plaintiff's Request for Accommodations

Aside from declining shifts because of illness and occasionally requiring several weeks off at a time to undergo medical procedures, the plaintiff requested an accommodation when she asked if she could utilize Mount Olivet's storage area to store her oxygen tank. (*Id.* at 83.) She explained that members of the public who were at Mount Olivet for a funeral sometimes "stared" and "asked why [she] was working if she was on oxygen." (*Id.* at 82.) None of her co-workers asked questions like that, and she never complained to any Mount Olivet representative about the comments and

---

[4] Wells understood that, when Morgan was the general manager at the Mount Olivet location, Withers worked "every other weekend opposite George Applejack," another part-time receptionist at that location, plus occasional weekdays on a "called-in basis." (Wells Dep. 27, 28.)

questions she received from members of the public. However, she testified that she asked her supervisor, Rodney Wells, whether "we" could "clear out a space in the back where some of the counselors sat so [she] could use [her] oxygen when [she] needed to the most" without feeling "uncomfortable." (*Id.* at 83.)

Withers made this request through a series of text messages to Wells on February 4, 2021, that read as follows:

> Hey Rodney. I won't be back at work until I get my new tanks and portable oxygen. Next week I'll be in and out of Vanderbilt and [St.] Thomas. I'm wondering if I can[] get a small spot in the back where the funeral directors office was. It's nothing but storage now if I could get a small cubby back there to just be able to sit there for my medicine and store my oxygen tanks and personal belongings instead of having everything crammed up front at the front desk with me I would greatly appreciate that. I don't wanna go back there claiming a spot if it's not permitted. There's plenty of desks and empty spots. I'm even willing to organize and clean that whole room.
>
> If not I understand.
>
> P.S. I'm out of the hospital finally. But I will be having another heart surgery and liver surgery done. Not sure when just yet.

(Doc. No. 25-2, at 7–8, 2–3; *see also* Withers Dep. 89–90.) Wells responded, "Chelsea I think we can make that work when you come back to work. Take care of yourself and I hope everything works out for you." (Doc. No. 25-2, at 1.) Withers replied: "Thank you, this means the world!" (*Id.*) At the same time, she sent a similar message to office manager Brian Davidson, and then followed up, telling him that she had run the same request by Wells and that he said "yes." (Doc. No. 25-3, at 126–27.) Davidson similarly responded, "I don't see a problem with it at all. Whatever would make you more comfortable." (*Id.* at 128.) And on February 21, 2021, just before she returned to work, she reminded Wells that she would have a portable oxygen cylinder "that I can keep in the back," to which Wells responded "[o]kay" and that he was glad she was able to return to work. (Withers Dep. 91.)

Withers testified, when asked directly, that she had no complaints about the way her request was handled. (*Id.* at 88 ("Q. And Mr. Wells said no problem? Or what did he say? A. I mean, he approved for it. Q. Okay. He approved for it. Do you have any complaints about the way that your request was handled? A. No.").) Notwithstanding, she now claims that Wells "failed to take any affirmative action in order to execute his approval of [her] request." (Doc. No. 28, Pl.'s Resp. to SUF ¶ 25.) That is, although he approved her request, "the space was never cleared out." (Withers Dep. 92.) She testified that she brings a claim in this lawsuit based on the fact that "nothing ever happened" following approval of her request. More specifically, despite telling Wells that there were "plenty of desks and empty spots" and that she was "even willing to organize and clean that whole room," she contends that she did not clear out any space and use it because "there were assigned desks to other counselors," so she was not sure what space she could use. (*Id.* at 83, 93.)

To be clear, the plaintiff claims that the defendant, and Wells specifically, denied her request for an accommodation, because he "never told when or if [she] could" clear out space. (*Id.* at 92; *see also id.* at 93 ("I wanted someone to tell me where could I sit, and then I would clear it out. I wasn't directed to where I could go.").) She was allowed to continue keeping the oxygen tank "right there with [her] at the reception desk"; that just was not her preference. (*Id.* at 168.)

During her deposition, the plaintiff was directly asked whether she was claiming that "someone at the company failed to accommodate a disability [she] had," to which she responded, "No." (*Id.* at 174.) Asked whether she was ever denied an accommodation that she sought, she again responded, "No." (*Id.*) She also never complained to anyone at Mount Olivet that she was being treated differently or discriminated against because of her health condition. (*Id.* at 168, 173–74.)

She now asserts that she requested days off for her doctor's appointments and procedures and that this, too, constituted a request for an accommodation. (Doc. No. 28, Pl.'s Resp. to SUF ¶ 24.) However, she also concedes that she was never denied requested days off or reprimanded or disciplined in any way for requesting days off for medical appointments and procedures. (*See* Withers Dep. 78–79, 98; *see id.* at 99 ("[Y]eah, I don't think there was ever any complaint or aggravation with it.").) She did "feel like people were aggravated" on the rare occasions when she became ill during a shift and had to leave early, but she was unable to point to any concrete evidence of such aggravation, and no one ever told her they were aggravated or expressed disappointment about her leaving early. (*Id.* at 79.)

The plaintiff also now claims that she requested breaks in order to have time to utilize her oxygen as needed and that her request for breaks to use her oxygen constituted a request for an accommodation. (Doc. No. 28, Pl.'s Resp. to SUF ¶¶ 7, 8, 24.) Her deposition testimony, however, does not support her assertion that she requested breaks as an accommodation for her disability or that they were in any way related to her medical condition. Instead, she testified only that "without the proper oxygen use and being able to break when [she] needed to," her health problems were exacerbated. (Withers Dep. 77.) When asked whether she was able to use oxygen when she needed to, she responded: "Most of the time, no, because I was helping with a service . . . unless I was like an actual reception [sic] for the day, then yes, I could sit there and be on it." (*Id.* at 84.) However, asked if she complained to anyone about needing breaks in order to use her oxygen, she said: "I don't – I don't really complain." (*Id.*) She did not complain to anyone about not being able to use her oxygen during services, and no one ever told her that she could not use her oxygen during services. (*Id.* at 85.) She stated that she "couldn't figure out who to complain to." (*Id.* at 124.) But she conceded that she knew Wells, and she admits that she received and reviewed Mount Olivet's

Employee Handbook that discussed making complaints. In addition, the plaintiff admits that she understood the multiple avenues available to her for reporting alleged discrimination or harassment, including Human Resources and the anonymous employee CareLine, as provided in the Employee Handbook. (*Id.* at 69–70.) She never told Wells or anyone else that she was not getting breaks to use her oxygen. (*Id.* at 126.)[5]

### D. The April 23, 2021 Conversation with Wells

During a conversation with Wells on April 23, 2021, which the plaintiff recorded and which was played during her deposition, Wells informed her that he would be changing the scheduling structure for Mount Olivet and that she would be working on a strictly call-in basis, as opposed to working any scheduled or routine shifts. Wells testified that the decision to change the scheduling structure at Mount Olivet was prompted by a reduced need for part-time staff and by his receipt of "complaints from coworkers that Withers was not answering the phones and was difficult to work with." (Doc. No. 25-4, Wells Decl. ¶ 6; *see also* Withers Dep. 108–09.) One reason for the reduced need for part-time staff during the week was that, in February 2021, SCI reassigned a full-time manager, Rick Blackburn, to Mount Olivet from another location. (Wells Dep. 30, 101–02; Wells Decl. ¶ 6.)

During the recorded conversation with Wells, the subject of Withers' health did not come up. (Withers Dep. 125.) Instead, the plaintiff objected to Wells that she did not understand how she was hard to work with and complained that she never got breaks:

---

[5] Withers asserts in response to the Motion for Summary Judgment that she "tried" to complain to Wells, citing her April 23, 2021 conversation with Wells (discussed herein), during which she told him she did not believe it was "fair" that her hours were being reduced and asked to speak to someone "higher up" than Wells. (Withers Dep. 114.) Wells told her only that Jeff Duffer was not the owner of the corporation, and he did not refer her to anyone else "higher up." (*Id.*)

MS. WITHERS: I don't understand how I'm hard to work with. I don't get breaks. I don't get excused to take any of my breaks. When I ask for breaks, I still get ignored.

MR. WELLS: Uh-huh (affirmative response).

MS. WITHERS: That's the only thing I've complained about, because I will come to work, and I'll work all day and I won't get a break. I can't step away from the desk without someone bickering at me. I can't – but people can go outside and smoke cigarettes three, four, five times a day. Like, I don't understand that.

MR. WELLS: Uh-huh (affirmative response).

(*Id.* at 108.) Although she complained to Wells that she was not getting breaks during this call, she did not associate her need for breaks with her health problems or needing to use oxygen, and she admits that her health was not mentioned during the recorded conversation. (*Id.* at 125.) Instead, when discussing this conversation during her deposition, she confirmed that she was simply talking about restroom breaks:

I didn't feel like it was fair that for me just to go to the restroom, I would kind of get, you know. looked at or get a certain attitude, too. But there are smokers who can go and spend 10, 15 minutes outside whenever they feel like smoking.

(*Id.* at 121.) This "attitude" was "an internal feeling" she had, not a "physical reaction from people," and no one "actually said anything to [her]" about her taking breaks. (*Id.*) In addition, when she worked Sundays, she was often the "only employee there," which meant no one was there to "release [her] . . . for a break." (*Id.* at 123.) But no one ever denied her permission when she asked to take a break. (*Id.*)

Withers disputed the complaints that she had not been answering the phones, claiming that the only time she had not answered the phones was when they were "rolled over" and were not ringing at the Mount Olivet location. (*Id.* at 109.) She believed the employee complaints against her were because she was "just a little bit too outspoken and honest to people, and they just can't handle it." (*Id.* at 116.) She denied that she was "complicated" (even though Wells never stated

that she was "complicated") and asserted that, if anything, the "company has been complicated," because something changed every other week and each of the funeral directors she worked with expected her to do things differently. (*Id.* at 111–12.) When she asked, Wells told her that she had the right to see the complaints against her and that she should simply send a request in writing so he could address it. (*Id.* at 110–11.) She never did so. (*Id.* at 125.)

Wells told her that, in any event, another current employee, George Applejack was going to work every Friday and Saturday at Mount Olivet, and she would be "on a call-in basis only." (*Id.* at 109–10.) Withers expressed frustration that she was already working only three or four days a month, and Wells acknowledged candidly that call-in basis meant that they would not "be calling [her] a lot." (*Id.* at 113.) Withers nonetheless stated that she did not intend to quit, and Wells confirmed that she was not being fired. (*Id.* at 114.)

### E.     The Plaintiff's Termination

As it turned out, the last shift Withers worked at Mount Olivet was April 23, 2021, the same day as the recorded conversation with Wells. According to Wells, Withers was not called to work any more shifts because Mount Olivet had no shifts it needed her to cover. (Wells Decl. ¶ 8.)

Following her April 23, 2021 shift, Withers texted Wells on two occasions: on June 16, 2021 and July 29, 2021. The first time, she asked about whether there were any opportunities to work, and the second time she asked whether she needed to take her "dignity" classes online, even though she was not being called to work. (Withers Dep. 134–35, 144; *see also* Doc. No. 25-1, at 318–19.) She also reached out to the location manager, Brian Davidson, on June 25, 2021 to ask about work. She told him she had heard—apparently from another employee with whom she was in contact—that they were "busy and understaffed," and she wanted to let him know that she was available. (Doc. No. 25-2, at 161.) She did not receive a response to any of these inquiries. (Withers Dep. 135.) She testified that she also attempted to call to see if she could return to work. She could

not remember when she called, but she believed it was a "few months" after her recorded conversation with Wells. (*Id.* at 129–30.) She never contacted human resources or SCI management to report or complain about not being scheduled to work. (*Id.* at 144.)

In April 2022, Wells began contacting dormant part-time employees to see if they were still interested in employment. He tried to call the plaintiff several times but discovered that her telephone number was no longer in service. (Wells Dep. 49, 50–51.) The plaintiff testified that her phone was disconnected for a period of time; when she regained service, she received a different phone number. She believes this happened toward the end of 2021. (Withers Dep. 11–13.)[6]

Because he was not able to get in touch with Withers, Wells emailed Brian Price, HR Manager for Mount Olivet, on April 25, 2022 to request approval to terminate her and another employee whom he was similarly unable to reach. (Wells Dep. 53–54.) He copied SCI's Market Director for the Nashville area, Jeff Duffer, on the April 25, 2022 email to Price.[7]

Price approved the terminations and also drafted letters for Wells to send to Withers and the other employee. (*Id.* at 96.) The letter to Withers is dated April 27, 2022 and states in relevant part:

> We have been unsuccessful in our attempts to reach you via telephone and email concerning your employment with Service Corporation International. Our records indicate that you last worked on April 9, 2021.[8]

---

[6] At another point in her deposition, she stated that she believed she got a new phone number not long after she stopped working in April 2021, because "from not working, [she] didn't have the money to pay [her] phone bill." (Withers Dep. 136.)

[7] The defendant cites Exhibit 19 to Wells' deposition, which is apparently a copy of the email to Price and Duffer. The defendant did not file a copy of this exhibit with its Motion for Summary Judgment, and it is noted in the transcript of Wells' deposition to be a "late-filed exhibit." (Doc. No. 25-3, at 5, 96.) The plaintiff, in any event, does not dispute the fact that Wells emailed Price on April 25, 2022, requesting authorization to terminate Withers and the other employee.

[8] As set forth above, Withers' actual last date worked was April 23, 2021.

> If you fail to communicate/reply (phone/text/email) to this letter by April 30, 2022 we will terminate your employment with a justification of job abandonment. Please contact me immediately if you want to discuss your situation . . . .
>
> If you are terminated as a failure to communicate/reply, you will be eligible for rehire. . . .

(Doc. No. 25-3, at 150.)

Although the letter was dated April 27, it was postmarked May 4, and Wells had no reason to dispute that it was mailed that day. (Wells Dep. 56–57; *see id.* at 58 ("It was probably laying on my desk. I forgot it.").) Withers received the letter on May 6, 2022, and she responded to it by sending a lengthy text message to Wells on May 8, 2022. Her text stated:

> I have tried reaching out to you over the months after our last encounter and never received a response. I was also told by you, that I probably wouldn't be called to work many hours. . . . I have even contacted you once a few months back, asking although I am not working my usual hours would I need to come in to complete my dignity classes and that message was also disregarded.
>
> I have realized my number was changed recently and I apologize on my end for not communicating those changes. However my email remains the same . . . . I am not sure if you have attempted to email as well, but I have not received an email.

(Doc. No. 25-2, at 202–03.)[9]

While Withers did not expressly ask to stay employed, she responded to the letter, and she did not state that she would decline any opportunity to work. Regardless, Wells and SCI considered Withers to be terminated effective May 4, 2022. (Wells Dep. 73.)

### F.     The EEOC Charge

Meanwhile, Withers had filed a Charge of Discrimination against Mount Olivet with the EEOC on September 30, 2021 (the "Charge"). (*See* Doc. No. 25-2, at 205.) Although the EEOC

---

[9] Wells responded that he had not tried to email her, because he did not have her email address, to which Withers replied that she assumed that he had her personal email address because she had provided it during the hiring process, and it was also on her employee profile. (Doc. No. 25-2, at 204.)

apparently made several attempts to contact SCI, it was unable to make contact for eight months. It first made contact with Amber Rausher, a paralegal at SCI's corporate office, about the Charge on May 4, 2022. (*See* Doc. No. 25-3, at 183–88.) Wells and Price learned of the Charge for the first time on May 6, 2022—months after Plaintiff originally filed it—when Rausher emailed them, seeking information about the allegations in the Charge. (Wells Dep. 72; *see also* Doc. No. 25-3, at 167.)

Wells was unaware of the Charge when he emailed Price on April 25, 2022 about terminating Withers and when he mailed the termination letter to Withers, and he was the first to inform Jeff Duffer about the Charge shortly after he learned about it. (Wells Decl. ¶¶ 9–11.) The EEOC issued Withers a Right to Sue Notice on July 29, 2022. (Doc. No. 25-2, at 215.)

### G. Procedural History

The plaintiff filed suit on October 27, 2022. (Doc. No. 1.) The Complaint asserts a single "count" for violation of the ADA, but three discrete claims within that count: that Mount Olivet (1) discriminated against Withers on the basis of her disability; (2) failed to engage in the interactive process and failed to provide reasonable accommodations for her disability; and (3) retaliated against her for engaging in protected activity. The defendant now seeks summary judgment on all claims against it.

## III. DISCUSSION

### A. Failure to Accommodate

#### 1. Legal Standards

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability" in regard to the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, "discrimination includes a failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (quoting 42 U.S.C. § 12112(b)(5)(A)). "Since failure to accommodate is expressly listed in the Act's definition of disability discrimination, 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.'" *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (citing 42 U.S.C. § 12112(b)(5)(A) and quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). Accordingly, courts apply the direct evidence test to failure-to-accommodate claims. *Id.*

The ADA requires employers to "mak[e] reasonable accommodations." 42 U.S.C. § 12112(b)(5)(A). A plaintiff who requires an accommodation bears the burden of proposing an accommodation and showing that it "seems reasonable on its face." *Id.* at 1229 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). Thus, to establish a *prima facie* case for failure to accommodate, a plaintiff must show that (1) she is disabled under the ADA; (2) she is otherwise qualified for the position, with or without a reasonable accommodation; (3) her employer knew or had reason to know of her disability; (4) she requested a reasonable accommodation; and (5) the employer failed to provide the reasonable accommodation. *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350 (6th Cir. 2015).

In addition, "[o]nce an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Blanchet*, 27 F.4th at 1232 (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018)). The purpose of the duty is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (quoting

*Kleiber*, 485 F.3d at 871). However, failure to engage in the interactive process "is an independent violation of the ADA only 'if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation.'" *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 572 (6th Cir. 2023) (quoting *Rorrer*, 743 F.3d at 1041).

In requesting an accommodation, the plaintiff must link it to her disability, so that the employer understands the request as one for an accommodation under the ADA. *Id.* at 570 (citing *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016) ("[I]n requesting an accommodation, we require plaintiffs not only to request to be accommodated, but to also provide their employers with a sufficient basis to understand that the request is being made because of their disability.").

### 2. The Plaintiff's Prima Facie Case

In this case, in her EEOC Charge and Complaint in this court, Withers alleges that, after she learned that she would need to use her oxygen tank more frequently, she asked her supervisor if she "could use a storage space to store [her] oxygen tank" and that her "supervisor approved." (Doc. No. 25-2, at 205; Doc. No. 1 ¶¶ 19–20.) Both parties agree that the plaintiff's request to store her oxygen tank in the storage space at Mount Olivet's offices constituted a request for an accommodation. And the plaintiff acknowledges that this request was granted. (Withers Dep. 88.)

However, she further alleges that, when she brought her oxygen tank to work, she was "not allowed to step away to use" it. (Doc. No. 25-2, at 205; Doc. No. 1 ¶ 21.) In her deposition, she appeared to allege that the problem was that, although Wells and Davidson both approved her putting her oxygen tank in the storage space, no one ever told her exactly where she should put it. In addition, she claims that she was not allowed breaks to use her oxygen when she needed to.

With respect to her claim that she was not granted any assistance in figuring out where to store her oxygen tank, the plaintiff's original message to Wells requesting space in the storage

room, dated February 4, 2021, said that "[t]here's plenty of desks and empty spots" and that Withers was "even willing to organize and clean that whole room." (Withers Dep. 89.) Wells approved the request. Then, on February 21, 2021, just before she returned to work, she told Wells, "I'm just informing you that I will be at my shift this coming Friday and Saturday. I have my portable cylinder that I can keep in the back for my oxygen." (*Id.* at 91.) Wells responded, simply, "Okay." (*Id.*) Withers did not ask for more direction or ever tell Wells she was confused about where exactly she should put her tank. Because it was clear that her request to store her tank in the back storage room had been granted, and she never suggested to Wells or anyone else that she did not know what space she was allowed to use, it is apparent that her request for an accommodation in the form of being permitted to store her oxygen tank in the storage room was granted. Mount Olivet cannot be faulted for failing to provide the plaintiff additional assistance in locating space when she had already identified the space: "plenty of desks and empty spots." She even expressed willingness to clean out the office. She never communicated to anyone that she did not feel comfortable selecting a spot without direction; she never requested direction. Because she failed to engage in further communication after her employer apparently believed it had granted what she had requested, Mount Olivet did not fail to provide a reasonable accommodation for the plaintiff's disability.

With respect to breaks, while Withers contends that she complained to Wells about not getting breaks, the facts, viewed in the light most favorable to the plaintiff, do not support her claim. First, she acknowledges that she was never denied a break when she asked for one, and the "attitude" she perceived from other employees when she requested restroom breaks was admittedly not supported by any overt action on the part of any employee. And, although Withers claims to have complained to Wells about not getting breaks, she did not connect her complaint with the

need to take breaks to use her oxygen.[10] In other words, she has produced no evidence that she ever notified her employer that her request for breaks was associated with her disability.

Because the plaintiff has not shown that Mount Olivet ever denied a request for an accommodation linked to her disability, she cannot establish a *prima facie* case of ADA discrimination in the form of a failure to accommodate. And because she cannot establish a *prima facie* case of failure to accommodate, she cannot make out a claim for failure to engage in the interactive process. *See Hrdlicka*, 63 F.4th at 572 (noting that the failure to engage in the interactive process "is an independent violation of the ADA only 'if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation'" (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014)). Here, the plaintiff's initial request was granted. If that was not sufficient, and the plaintiff needed something more or different, she had an obligation to communicate the additional accommodation she needed. Because she did not do so, and the employer had no reason to know she needed an additional accommodation, her claim based on the failure to accommodate fails, which also spells the demise of any claim based on the alleged failure to engage in the interactive process. The defendant is entitled to summary judgment on the plaintiff's failure to accommodate claim, which incorporates a claim based on a purported failure to engage in the interactive process.

## B.    Disability Discrimination

The Complaint is somewhat vague about what disability discrimination the plaintiff suffered, but she has clarified on the record that she contends that she was discriminated against on the basis of disability when she suffered two distinct adverse employment actions: (1) she was

---

[10] She also apparently did not complain until the day Wells told her other employees had complained about her. As this turned out to be her last day at work, Mount Olivet did not have the opportunity to accommodate any request for breaks, whether or not related to her disability.

removed from the schedule altogether on April 23, 2021; and (2) she was formally terminated effective May 4, 2022.

> 1. *Legal Standards*

In the absence of direct evidence, courts use the familiar *McDonnell Douglas* burden-shifting framework to establish disability discrimination under the ADA. *Hrdlicka*, 63 F.4th at 566 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) she has a disability; (2) she is otherwise qualified for the job, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) her employer knew or had reason to know of her disability, and (5) her position remained open, or she was replaced. *Id.*; *see also Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017)). In situations not involving termination, the fifth element may be established by proof that "similarly situated non-protected employees were treated more favorably." *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007).

Once the employee establishes a *prima facie* case, the employer then has the burden of "demonstrating that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Hrdlicka*, 63 F.4th at 567 (citations omitted). "The burden then shifts back to the employee to show that the purported nondiscriminatory reason was actually a pretext designed to mask discrimination." *Id.* (citations and internal quotation marks omitted).

> 2. *The Plaintiff's Prima Facie Case*

Mount Olivet does not dispute that the plaintiff can prove the first four elements of her *prima facie* case, but it argues that she cannot establish the fifth—that her position remained open, that she was replaced by someone outside her protected class, or that non-protected employees were treated more favorably.

"For purposes of articulating a *prima facie* claim under the ADA, an 'employee is replaced only where another employee is hired or reassigned to perform [her] duties." *Sukari v. Akebono Brake Corp.*, 814 F. App'x 108, 112 (6th Cir. 2020) (quoting *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 454 (6th Cir. 2011)). However, "[w]here a plaintiff's roles and responsibilities are re-assigned or redistributed among current employees—as opposed to reassigned completely to one other employee—the position is not considered 'replaced.'" *Id.* (quoting *Webb*, 438 F. App'x at 454). That is, "spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992), *quoted in Sukari*, 814 F. App'x at 112.

According to Mount Olivet, the plaintiff was never replaced. Instead, after Rick Blackburn was moved to Mount Olivet from a different facility as a full-time office manager sometime in February 2021, Mount Olivet had a reduced need for part-time employees. Those part-time shifts that remained to be filled were picked up by other existing part-time workers. (Wells Dep. 29–31, 101; *see also* Def's Resp. to Pl.'s Interrog. Nos. 7, 8, Doc. No. 25-3, at 135–36.)[11]

In response, the plaintiff indeed argues that, after her last day of work in April 2021, her duties were absorbed by Blackburn, a non-disabled employee. (Doc. No. 29, at 9.) She also contends, somewhat contrarily, that Blackburn, George Applejack, and "an unknown female receptionist" replaced her, and that she has therefore established a *prima facie* case of discrimination. (*Id.*) In support, she cites only Wells' deposition testimony about bringing

---

[11] Mount Olivet also contends that the plaintiff cannot show that she was treated differently from similarly situated non-disabled employees. It contends that a non-disabled employee, Ron Hamm, was terminated at the same time and for the same reason as Withers in May 2022 and that, if she attempts to compare herself to office manager Rick Blackburn, such attempt would fail, because she was not similarly situated to a full-time, management-level employee. The plaintiff, however, makes no attempt to show that she was treated less favorably than any similarly situated non-disabled employee.

Blackburn over to Mount Olivet full time in February 2021—two months *before* the plaintiff's April 2021 conversation with Wells.

As set forth above, however, the record establishes that Blackburn's transfer preceded the conversation with Wells and that it reduced, but did not eliminate, the need for part-time employees at Mount Olivet. Blackburn therefore did not completely "replace" Withers, who primarily worked every other weekend and only occasionally during the week. Instead, his presence reduced the need for fill-in shifts during the week, and those shifts that remained to be staffed were filled by other existing employees, including Applejack. The plaintiff presents no evidence to support her claim regarding the "unknown female receptionist." Regardless, she does not contend that any one person absorbed all of her job duties or shifts, and, as set forth above, the law is clear that, when a plaintiff is not replaced by a single employee, whether a new employee or an existing employee who takes on the plaintiff's job, she cannot show that she was "replaced." *See Sukari*, 814 F. App'x at 112 ("Where a plaintiff's roles and responsibilities are re-assigned or redistributed among current employees—as opposed to reassigned completely to one other employee—the position is not considered 'replaced.'"); *Lilley*, 958 F.2d at 752 ("[S]preading the former duties of a terminated employee among the remaining employees does not constitute replacement."). The plaintiff also has no evidence that she was replaced after her formal separation in May 2022, by which time she had not worked any shifts for over a year. And she makes no attempt to show that she was treated less favorably than any non-disabled employees.

In short, the plaintiff has not established the fifth element of her *prima facie* case in connection with her removal from the schedule in April 2021, and the court has no need to consider whether the plaintiff can establish that the defendant's proffered reasons for her removal from the schedule and her termination a year later are pretextual. Regardless, Mount Olivet has clearly

articulated reasons for its actions—a reduced need for part-time employees, complaints from other employees about the plaintiff's performance, and the plaintiff's failure to contact Mount Olivet with her new phone number or request to be placed on the schedule for at least ten months prior to her formal termination. The plaintiff has not proffered any real evidence suggesting that these reasons had no basis in fact, did not actually motivate the decision, or were insufficient to motivate the decision.

The defendant is entitled to summary judgment on this claim as well.

### C.    Retaliation

Under the ADA's anti-retaliation provision, it is unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). In addition, although not specified, "requests for accommodation are protected acts" for purposes of this provision. *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015) (quoting *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013)).

Because the plaintiff has no direct evidence of retaliation, the claim is analyzed using the *McDonnell Douglas* burden-shifting approach. *Rorrer*, 743 F.3d at 1046. Under this test, as applied in this context, the plaintiff bears the initial burden of establish a *prima facie* case of retaliation, which requires showing that "(1) [she] engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 304 (6th Cir. 2019) (quoting *Rorrer*, 743 F.3d at 1046). Only if the plaintiff makes the requisite showing does the burden shift to the employer to "articulate a legitimate, nondiscriminatory reason for its actions." *Laughlin v. City of Cleveland*,

633 F. App'x 312, 315 (6th Cir. 2015) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)).

"The decisionmaker's knowledge of the protected activity is an essential element of the *prima facie* case of unlawful retaliation." *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) ( (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002)); *see also Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008) ("[E]ven to prove a causal connection, [the plaintiff] must establish that the decisionmakers involved in the [employment actions] at issue had knowledge of the protected activity, as one cannot retaliate against an employee for engaging in protected activity unless he knew the employee had done so.").

In this case, the plaintiff engaged in protected activity, for purposes of the ADA, when she filed an EEOC charge. She claims that she suffered retaliation when her employment was formally terminated on May 4, 2022. She also contends that, "[a]fter [she] requested accommodations for storage of her oxygen tanks and breaks to use her oxygen, [Mount Olivet] began the process of retaliation." (Doc. No. 29, at 13.) More specifically, she claims that Mount Olivet "took no action" in response to her "multiple attempts to obtain a place to store her oxygen during the workday" and "ignored" her requests for breaks to use her oxygen. (*Id.*) She claims to have suffered an adverse action related to this protected activity when she was removed from the schedule after her April 23, 2021 conversation with Rodney Wells.

### 1.    *Retaliation for Filing EEOC Charge*

Although the plaintiff attempts to create a material factual dispute as to this point, the record is clear that Wells and the other decisionmakers (Brian Price and Jeff Duffer) did not know that the plaintiff had filed an EEOC Charge until May 6, 2022, two days after Wells mailed the termination letter to her and more than a week after Price had authorized the termination. Because the plaintiff must show that the decisionmaker knew about the protected activity in order to

establish a causal connection between it and the adverse employment action, the plaintiff cannot

establish a *prima facie* case of retaliation in connection with the EEOC Charge and her May 4,

2022 termination.

2. *Requesting Accommodations*

As for Withers' contention that Mount Olivet "began the process of retaliation" when it

took "no action" in response to her "multiple attempts to obtain a place to store her oxygen during

the work day" and then took her off the schedule immediately after she "took it upon herself to

take breaks to use her oxygen" (Doc. No. 29, at 13–14), this argument is simply not supported by

the factual record. As discussed above, Withers' request to store her oxygen tanks was granted,

and she never followed up with Wells or anyone else for assistance in figuring out what space,

exactly, was available for her to use. Her supervisors had no reason to know she needed assistance

in figuring out where to put her oxygen tank. Davidson's last word on the subject was "Whatever

would make you more comfortable. And have your own space." (Doc. No. 25-3, at 128.) Wells'

last response, when she reminded him that she was returning to work and would have her oxygen

cylinder "that [she] can keep in the back," was "[o]kay" and he was glad she was able to return to

work. (Withers Dep. 91.) The ball was clearly back in her court to clarify her request or ask for an

additional accommodation, if she needed it, but she did neither.

Nor does Withers provide evidence that she ever requested or took breaks to use her

oxygen. Instead, she stated that, "[m]ost of the time," she was not able to take breaks when she

needed oxygen, because she would be in the middle of assisting with a funeral service. (*Id.* at 84.)

However, she never complained about not being able to use her oxygen during services; no one

ever told her she could not use oxygen during a service, and she never asked anyone for a break to

accommodate her need for oxygen. (*Id.* at 84, 85.) She acknowledged, in fact, that when she asked

for breaks, she got them, and "no one denied [her] a break," for any reason. (*Id.* at 123–24.) In her

April 2021 conversation with Wells, she complained only about getting "attitude" from other employees when she requested restroom breaks. (*Id.* at 121.)

The plaintiff also argues that, when Wells removed her from the schedule, he "confirmed her suspicion that other employees had issues with her," and she "confirmed that these issues related back to her health and need for accommodation." (Doc. No. 29, at 14 (citing Withers Dep. at 50–51, 52).) But other employees' complaints about her do not establish that her *employer* discriminated or retaliated against her, and her claim that she "confirmed that these issues related back to her health" is simply not supported by the record.[12] Rather, the transcript of the conversation with Wells shows her conviction that the complaints were because she was "just a little bit too outspoken and honest to people, and they just can't handle it." (Withers Dep. 116.) She claimed that she felt other employees gave her "attitude' when she simply requested a restroom break—even though other people took cigarette breaks multiple times a day—and that the only time she failed to answer the phone was when the phones were not working correctly. (*Id.* at 108–09, 116, 119–21.) Withers herself conceded that the topic of her health never came up during the conversation. (*Id.* at 52, 125.)

Withers next asserts that, "[d]espite [Mount Olivet's] allegation that [the company] had a decreased need for part-time employees at this time, [it] continued to employ Mr. Applejack, a part-time employee, and the female receptionist that Ms. Withers saw before her April 2021 meeting with Mr. Wells," and it "also moved a full-time employee, Mr. Blackburn, to their Mount

---

[12] Withers' recollection of her conversation with Wells is contradicted by the actual transcript of that conversation. For instance, Withers testified that Wells told her she was "complicated to work with," but the actual transcript of the call confirms that he actually reported that other employees had complained that she was "[h]ard to work with." (Withers Dep. 50–51, 108.) Withers herself was the one who protested that she was not "complicated" and that the only thing she had ever complained about was not getting breaks when everyone else got smoke breaks whenever they felt like it. (*Id.* at 110, 111, 116.)

Olivet location and allowed him to perform Ms. Withers' reception duties as well." (Doc. No. 29, at 14 (citing Withers Dep. 109, 101–02).) It is unclear how these contentions relate to retaliation. Instead, they show, as discussed above, that her former duties were spread among several existing employees, such that she was not replaced. *Lilley*, 958 F.2d at 752. Her allegation that she saw a female receptionist at Mount Olivet just before her April 2021 conversation with Wells establishes nothing, since there is no information in the record about who that employee was or why she was there.

Withers also asserts that she received word from another Mount Olivet employee in May 2021 that it needed more employees. However, that statement constitutes rank hearsay that the plaintiff has made no attempt to substantiate; nor has she argued that she would be able to present evidence to support the statement "in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2). Even if the court could consider this statement, it would go toward the question of whether the defendant's reasons for its employment action is pretext for discrimination, which the court need consider only if the plaintiff establishes a *prima facie* case.

Finally, the plaintiff asserts that the "timeline of events establishes a material fact in dispute that Defendant's decision to remove Ms. Withers from the schedule came as retaliation for her requests for accommodation." (Doc. No. 29, at 14.) In other words, the only potential causal connection between the plaintiff's protected activity (asking for a place to store her oxygen tank in February 2021) and the adverse action (being removed from the schedule on April 23, 2021) is the temporal relationship between those events. The plaintiff points out that, in the Sixth Circuit, when "an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation."

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). However, the same case states that, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with *other evidence of retaliatory conduct* to establish causality." *Id.* (emphasis added); *see also Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) (holding that a "roughly 75-day delay between [the plaintiff's] protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation and, therefore, that the plaintiff needed "to provide other indicia to support a causal connection").

In this case, roughly ten or eleven weeks elapsed between the plaintiff's request for an accommodation and her being removed from the schedule. The court finds that this timing is not sufficiently close that it qualifies as evidence of causation without "some other evidence of retaliatory conduct." *Mickey*, 516 F.3d at 525. The plaintiff has no other evidence of retaliatory conduct to support an inference of causation. Without some evidence of a causal connection, her *prima facie* case of retaliation premised on her request for an accommodation fails, and the court has no need to consider the question of whether the defendant's proffered reasons for its action are pretext for retaliation.

## IV. CONCLUSION

For the reasons set forth herein, the defendants' Motion for Summary Judgment (Doc. No. 128) will be granted and this case dismissed in its entirety. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge